# STATE OF MICHIGAN

# COURT OF APPEALS

PANTALL GALLUP, LLC, d/b/a VAN BUREN
OIL, VAN BUREN OIL, LLC, and BARRICK
ENTERPRISES, INC.,

      Plaintiffs-Appellants/Cross-
      Appellees,

v

MOHAMAD ALNOURI, EXPRESS GAS CO.,
and EXPRESS OIL CO.,

      Defendants-Appellees/Cross-
      Appellants.

UNPUBLISHED
November 6, 2014

No. 314852
Wayne Circuit Court
LC No. 09-022876-CK

EXPRESS OIL CO.,

      Plaintiff/Counter-Defendant-
      Appellee/Cross-Appellant,

v

PANTALL GALLUP, LLC, d/b/a VAN BUREN
OIL,

      Defendant/Counter-Plaintiff-
      Appellant/Cross-Appellee,
and

BARRICK ENTERPRISES, INC.,

      Defendant/Counter-Plaintiff-
      Appellant.

No. 314855
Wayne Circuit Court
LC No. 08-122427-CK

Before: GLEICHER, P.J., and SERVITTO and RONAYNE KRAUSE, JJ.

-1-

PER CURIAM.

In docket no. 314852, Pantall Gallup, LLC d/b/a Van Buren Oil ("Pantall"), Van Buren Oil, LLC, ("Van Buren") and Barrick Enterprises, Inc. appeal as of right the jury verdict entered against Pantall and Van Buren and in favor of Express Oil Co., as well as the trial court's denial of their pre-trial and post-trial motions. In docket no. 314855, Mohamad Alnouri ("Alnouri"), Express Gas Co. and Express Oil Co., cross-appeal the trial court's denial of their motion for judgment notwithstanding the verdict concerning the jury's finding in favor of Pantall and Van Buren and against Alnouri and Express Gas Co. on their claim of conversion and challenging the trial court's award of treble damages and attorney fees on this claim. We affirm.

Pantall is a wholesale provider or "jobber" of petroleum products, including gasoline. It obtains petroleum products from large oil companies and sells them to customers (such as gas stations), often through "sub-jobbers." Express Oil Co. ("Express Oil"), owned by Alnouri, is one such sub-jobber. Sub-jobbers obtain customers for jobbers, negotiate the terms of new contracts with customers on behalf of the jobbers, and frequently collect money from the customer on behalf of the jobbers. The oil company sets the daily price for gasoline for the jobber, who then adds the cost of freight and other expenses onto the price and relays that new price to the sub-jobber. The sub-jobber, in turn, adds a few cents profit per gallon to the costs for himself, and charges the final price per gallon to the customer.

Relevant to the instant matter, Express Oil and Pantall entered into a 10 year sub-jobber agreement in July 1997 and the contract automatically renewed for another 10-year period in July 2007. Under the terms of the agreement, Express Oil was to provide billing and collection for the petroleum products sold on behalf of Pantall, and Pantall was to deliver the product. In reality, Pantall not only delivered the petroleum products to the customers, it also directly invoiced them for the products delivered, while Express Oil collected payments from the customers and submitted them to Pantall. Pantall then remitted 3 cents per gallon of petroleum products sold directly to Express Oil as its commission.

In 2007, after the contract automatically renewed, Pantall began deducting what Express Oil believed to be inappropriate amounts from its monthly commissions. In July 2008, Pantall attempted to terminate the agreement when, according to Express Oil, none of the triggering events specified in the parties' contract that would serve as bases for termination had occurred. Express Oil thus initiated an action against Pantall (and/or Barrick Enterprises, Inc. and Van Buren as successors in interest to Pantall).

Pantall, on the other hand, claimed that it had not received all of the monies for products it had delivered to customers under the sub-jobber agreement with Express Oil and that Express Oil had breached the parties' contract and engaged in conversion or fraud. Pantall later determined that Express Gas Co. ("Express Gas"), also owned by Alnouri, was depositing receipts from Express Oil's customers and that it further appeared that Express Gas was paying expenses of Express Oil necessitating the addition of Express Gas as a party.

A trial was ultimately held on Express Oil's claim against Pantall (and/or Barrick Enterprises, Inc. and Van Buren) for breach of contract, Pantall's counter-claim against Express

Oil for breach of contract and for allegedly doing so first, and Pantall's claim against Express Oil, Express Gas and Alnouri for conversion. The jury found that Pantall breached the sub-jobber agreement with Express Oil and that its damages were $1.1 million. The jury further found that Express Oil also breached the sub-jobber agreement, but that it was not the first to do so. It did, however, find that Express Gas and/or Alnouri converted property belonging to Pantall/Van Buren and that its damages were $33,781.84. The trial court entered a judgment on the jury verdict in favor of Express Oil on its breach of contract claim against Pantall d/b/a Van Buren Oil and Van Buren jointly and severally, and in favor of Pantall d/b/a Van Buren Oil and Van Buren on their conversion claim against Express Gas and Alnouri. The trial court trebled the damages entered against Express Gas and Alnouri. All parties filed various post-judgment motions, all of which were denied by the court.

On appeal, defendants[1] first contend that the trial court erred in denying their motion for JNOV where the testimony of Express Oil's expert was inadmissible under MRE 702 and Express Oil otherwise failed to support the damages amount awarded by the jury. Defendants alternatively argue that either remittitur or a new trial is appropriate. We disagree.

We review de novo a trial court's denial of motions for JNOV. *Abke v Vandenberg*, 239 Mich App 359, 361; 608 NW2d 73 (2000). We view the evidence, as well as any legitimate inferences, in the light most favorable to the nonmoving party and decide whether there existed a factual question about which reasonable minds might have differed. *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998).

This Court reviews the qualification of a witness as an expert and the admissibility of the testimony of the witness for an abuse of discretion. *Surman v Surman*, 277 Mich App 287, 304–305; 745 NW2d 802 (2007). An abuse of discretion occurs when a trial court chooses a result that falls outside the range of reasonable and principled outcomes. *Id.* at 305. However, when the trial court's decision to admit evidence involves a preliminary question of law, the issue is reviewed de novo, and admitting evidence that is inadmissible as a matter of law constitutes an abuse of discretion. *Barnett v Hidalgo*, 478 Mich 151, 159; 732 NW2d 472 (2007).

A trial court's decision regarding remittitur is likewise reviewed on appeal for an abuse of discretion. *Palenkas v Beaumont Hospital*, 432 Mich 527, 533; 443 NW2d 354 (1989). In determining whether remittitur is appropriate, the proper consideration is whether the jury award was supported by the evidence. *Carpenter v Consumers Power Co*, 230 Mich App 547; 562; 584 NW2d 375 (1998), vacated on other grounds, *Case v Consumers Power Co*, 463 Mich 1; 615 NW2d 17 (2000). This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented. *Palenkas*, 432 Mich at 532.

MRE 702, governing testimony by experts, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

---

[1] "Defendants" refers to Pantall and Van Buren, unless otherwise specified.

an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule "incorporates the standards of reliability that the United States Supreme Court described to interpret the equivalent federal rule of evidence in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993)." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). The trial court must act as a gatekeeper to ensure that all expert opinion testimony is reliable. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780–781; 685 NW2d 391 (2004). According to *Gilbert*:

> This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Id.* at 782.]

"While there 'must be facts in evidence to support the opinion testimony of an expert,' circumstantial proof that enables reasonable inferences is sufficient." *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012)(citation omitted). "When reviewing a trial court's decision to admit evidence, we do not assess the weight and value of the evidence, but only determine whether the evidence was the kind properly before the jury." *Cole v Eckstein*, 202 Mich App 111, 113-114; 507 NW2d 792 (1993).

In this case defendants do not challenge the qualifications of Express Oil's expert, Michael Portis, to testify as an expert on the issue of Express Oil's damages. Nor do they challenge that specialized knowledge would assist the trier of fact in determining a fact in issue, i.e., whether and to what extent Express Oil suffered any damages if, as it claimed, defendants breached the parties' sub-jobber agreement or even, technically, the methodology employed by Portis in reaching his conclusions. Defendants take issue with the figures used by Portis in his calculations, arguing that he used figures based upon guesswork and assumptions rather than facts and thus his testimony did not comport with the requirements of MRE 702, specifically requirement (1), that the testimony be based upon sufficient facts or data.

Portis testified that in order to calculate Express Oil's lost earnings from July 1, 2008, through July 1, 2017, (the date the contract would have expired), he looked at its answers to defendant's interrogatories which provided the gross revenue for Express Oil from January 2007 through April 2008. Portis testified that he also had a document provided to him by Alnouri showing Express Oil's gross revenues for the first six months of 2006. Portis testified that the starting point for any type of loss analysis would be gross revenue. He took the 30 months of gross revenue information that he had and came up with an average monthly gross revenue. Portis testified that the past 30 months prior to when the contract ended supplied a good sample

of what the future earnings would be. Portis then determined a reasonable monthly business expense for plaintiff of $4000, based on his experience as an accountant and on discussions with Alnouri and the fact that Alnouri had a part-time employee, and had a rent expense of $1200 per month as well as phone expenses and other miscellaneous business expenses. Portis deducted the $4000 expense from the average monthly gross revenue, which would be $16,232 per month and, when that amount was multiplied by the first 28 months (from July 1, 2008, to the time of trial) the figure was $454,496. For the remaining contract term, Portis multiplied the same figure, $16,232, by the remaining months, and, using a present value figure, came up with an additional $1,138,181, for a total of $1,592,677. Portis testified that the calculation was reasonable within normal accepted accounting procedures and was an accurate figure of lost earnings.

Portis further testified that he did not use Express Oil's corporate tax returns in calculating his analysis because he had the gross revenues of Express Oil from defendants and because tax returns are prepared using different accounting principles. According to Portis, tax basis accounting is generally used to reduce income as much as possible through using accelerated appreciation and there is an incentive for a business to invest in capital, which the IRS allows in order to accelerate that deduction. For generally accepted accounting principles, however, one uses a depreciation deduction, which is a lesser deduction. Portis testified that he did look at Express Oil's tax returns after he calculated his analysis but he did not rely on them in order to reach his conclusions and that he had Express Oil's bank records available to him at the time he prepared his analysis but did not look at them.

When asked to compare the actual expenses claimed by Express Oil on its tax returns and the $4000 used by Portis, Portis testified that it was not comparing "apples to apples." Portis testified that some of the expenses reported on an income tax form may not necessarily have to have been incurred in order to generate the revenue.

Based on the nature of the testimony elicited and the indication that Portis' testimony constituted opinion based on his experience, the trial court did not err in admitting his testimony. Defendants assert that Portis' testimony is based on speculation and assumptions when the actual data concerning Express Oil's gross income and expenses can be gleaned from its income tax returns. However, defendants conveniently ignore that Portis testified that he relied on *defendants'* sworn answers to interrogatories as to what it paid Express Oil for the vast majority of the months on which he based his projections and on Alnouri's statements as to what his actual monthly expenses were.

Further, Mirna Rahal, secretary for Express Oil, testified that she handled the monies that went into Express Oil's account. Rahal testified that she put monies into the account from other companies that Express Oil bought gas from and companies that Express Oil bought kerosene from. Alnouri also testified that Express Oil also sells kerosene for other companies and is a sub-jobber for another petroleum company. Thus, while defendants contend that the testimony of Portis conflicted with the "known facts" available in Express Oil's tax returns and bank documents, the income and expenses reflected in the same would not necessarily be limited to income and expenses attributable solely to defendants. As Portis' job was to calculate only that loss attributable to defendants' alleged breach of its sub-jobber contract with Express Oil (Express Oil's income from defendants minus its expenses credited at least in part to defendants)

his reliance on the gross profits earned by Express Oil as stated by defendants was reasonable. Had defendants been the sole source of Express Oil's income, or Express Oil's sole customer, defendants' argument would be more persuasive. While it is true that an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts (*Badalamenti v William Beaumont Hospital-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999)), defendants have not established that Portis' opinions were based on assumptions, nor have they established that the tax returns constituted "established facts" of Express Oil's actual gross income and expenses attributable to and from only defendants.

In addition, defendants have provided no expert testimony of their own to controvert Portis' testimony that his method was reliable or that the use of tax documents was not the proper method upon which to base a calculation of lost profit. Portis explained that different accounting methods were used when filing taxes as opposed to calculating lost profits and defendants have provided no law or expert testimony to refute this testimony. Defendants rely primarily upon federal cases citing *Daubert*, 509 US 579, and the general principles that a court must adhere to its gate keeping role. *Daubert* sets forth a list of non-exhaustive factors to guide courts in assessing the reliability of expert testimony but, as federal cases generally hold, where an expert's testimony constitutes not scientific, but instead "other specialized knowledge" (such as Portis'), "the factors enumerated in *Daubert* cannot readily be applied to measure the reliability of such testimony" and "the relevant reliability concerns may focus upon personal knowledge or experience." *Surles ex rel Johnson v Greyhound Lines, Inc*, 474 F 3d 288, 295 (CA 6 2007). Thus, Portis' opinions as to an appropriate monthly expense based partly upon his experience as a CPA as well as his opinions concerning the reasons for not using tax returns as a basis to calculate lost profits may well have met the reliability standards required of the trial court.

Finally, an opposing party's disagreement with an expert's opinion or interpretation of facts is directed to the weight to be given the testimony, and not its admissibility. *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 401; 628 NW2d 86 (2001). Because defendants' disagreement is with the numbers used by Portis and not with the methodology or with his credentials, their concerns relate more to Portis' credibility, which is solely for the jury to determine. *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 635; 769 NW2d 911 (2009). Ultimately, "it is the factfinder's responsibility to determine the credibility and weight of trial testimony." *King v Reed*, 278 Mich App 504, 522; 751 NW2d 525 (2008).

The trial court did not abuse its discretion or err in allowing in Portis' testimony and did not err in denying defendants' motion for JNOV. For the same reasons set forth above, the trial court did not abuse its discretion in denying defendants' motion for remittitur.

Defendants next argue that Express Oil is guilty of spoliation of evidence and that its complaint for breach of contract should have been dismissed by the trial court as a sanction or, alternatively a new trial should be ordered because the spoliation deprived defendants of its right to a fair trial. Defendants contend that at the new trial, the jury should be instructed that a presumption exists that the missing records were unfavorable to Express Oil. We disagree.

A properly preserved challenge to the jury instructions is reviewed de novo on appeal. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002). Jury instructions are

reviewed as a whole in order to determine the presence of reversible error. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). With respect to an unpreserved challenge to a jury instruction, "[f]ailure to timely and specifically object precludes appellate review absent manifest injustice." *Bouverette*, 245 Mich App at 403. "Manifest injustice results where the defect in instruction is of such magnitude as to constitute plain error, requiring a new trial, or where it pertains to a basic and controlling issue in the case." *Mina v General Star Indemnity Co*, 218 Mich App 678, 680–681; 555 NW2d 1 (1996), rev'd in part on other grounds 455 Mich 866; 568 NW2d 80 (1997).

A party has a duty to preserve evidence "[e]ven when an action has not been commenced and there is only a potential for litigation." *Brenner v Kolk*, 226 Mich App 149, 162; 573 NW2d 65 (1997). This duty to preserve evidence includes all evidence "that [a party] knows or reasonably should know is relevant to the [anticipated] action." *Id.* Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in litigation that is pending or for reasonably foreseeable litigation." *Silvestri v Gen Motors Corp*, 271 F3d 583, 590 (4th Cir, 2011).

When spoliation of evidence occurs, whether intentionally or unintentionally, and the other party is unfairly prejudiced because it is unable to challenge or respond to the evidence, a trial court has the inherent authority to sanction the culpable party to preserve the fairness and integrity of the judicial system. *Brenner*, 226 Mich App at 160. The trial court must carefully fashion a sanction that denies that party the fruits of its misconduct, but that does not interfere with the party's right to produce other relevant evidence. *Bloemendaal v Town & Country Sports Ctr Inc*, 255 Mich App 207, 212 659 NW2d 684 (2002). We review a trial court's decision to sanction a party for spoliation of evidence for an abuse of discretion. *Brenner*, 226 Mich App at 160-161.

"Dismissal of a case is a drastic step. Before imposing such a sanction, the trial court must consider lesser sanctions." *Citizens Ins Co of America v Juno Lighting, Inc*, 247 Mich App 236, 243; 635 NW2d 379 (2001) (citation omitted). Other possible sanctions include "the exclusion of evidence that unfairly prejudices the other party or an instruction that the jury may draw an inference adverse to the culpable party from the absence of the evidence." *Bloemendaal*, 255 Mich App at 212. An adverse inference permits the factfinder to conclude that the spoliated evidence would have been adverse to the opposing party. *Brenner*, 226 Mich App at 155–56. A jury may draw an adverse inference against a party that has failed to produce evidence only when: (1) the evidence was under the party's control and could have been produced; (2) the party lacks a reasonable excuse for its failure to produce the evidence; and (3) the evidence is material, not merely cumulative, and not equally available to the other party. *Ward v Consolidated Rail Corp*, 472 Mich 77, 85-86; 693 NW2d 366 (2005). However, "missing evidence gives rise to an adverse presumption only when the complaining party can establish 'intentional conduct indicating fraud and a desire to destroy [evidence] and thereby suppress the truth.' " *Id.* at 84, quoting *Trupiano v Cully*, 349 Mich 568, 570; 84 NW2d 747 (1957).

According to defendants, Alnouri admitted that he had all of the records for Express Oil after they were given to him by his secretary at the end of July, several weeks after defendants had sent their notice of contract termination and after they had attempted to recoup their monies

from Express Oil. However, once it became clear that litigation would ensue, Express Oil's business records, including receipts and invoices, were gone and Alnouri was unable to locate them in violation of his duty to preserve evidence that he knew or reasonably should have known would be relevant to the action. Defendants thus assert that Express Oil's claim for breach of contract against them should have been dismissed as a sanction.

Assuming, without deciding that spoliation occurred, dismissal would not be an appropriate sanction. First, the timing of this motion for dismissal as a sanction-post-trial-is inappropriate. Notably, defendants did not base their motion for directed verdict at trial on spoliation. Instead, they simply asked for a jury instruction that the missing evidence was presumed to be adverse to Express Oil based upon spoliation. Were dismissal appropriate, the time to seek dismissal was prior to an adverse jury verdict. Instead, defendants attempted to harbor this issue as an appellate parachute; something this Court has long found impermissible. *Marshall Lasser, PC v George*, 252 Mich App 104, 109; 651 NW2d 158 (2002). Accordingly, defendants waived review of this issue. See, e.g., *Freed v Salas*, 286 Mich App 300, 308; 780 NW2d 844 (2009)(failure to argue that the dismissal of one's employee in a negligence suit also required dismissal of employer sued under theory of respondeat superior precluded this argument made post-trial).

Second, dismissal is a drastic sanction reserved for when a party engages in egregious conduct. *Brenner*, 226 Mich App at 163. And, as previously indicated, a trial court considering spoliation sanctions *must* evaluate all potential sanctions before ordering a dismissal. *Bloemendaal*, 255 Mich App at 214 (emphasis added). Although Alnouri was deposed prior to trial, this Court was not provided with a complete copy of Alnouri's deposition. In the portions that we did review, Alnouri was not questioned about the location of the business records. This may be because Alnouri's deposition was taken prior to his secretary's, who testified that she kept a register and the other records at issue and gave them to Alnouri when the door to Express Oil closed. In any event, Alnouri testified at trial that he provided defendants with whatever business documents he had. He testified that he did not know where the check register that his secretary said she kept was located and he denied destroying anything. Alnouri testified that where checks were deposited in defendants' account, they would have a record of that. He testified that cash was deposited into his own account, but some of it was from other petroleum and kerosene suppliers, some was for rent, and some was from defendants, which he paid back. Alnouri further testified that he had to move when he closed his business and does not know where the business documents went. He testified that his office packed everything in boxes and moved out of the building and that he looked everywhere for the check registers. Defendants have not offered anything to contradict the above or otherwise show that the loss of the documents was deliberate or intentional.

Nor is there any indication that the conduct was egregious or deprived defendants of a fair trial. Defendants' claims were for breach of contract and conversion. Defendants thus bore the burden of proof (persuasion) for all elements necessary to establish their causes of action and this burden never shifts during trial. *Kar v Hogan*, 399 Mich 529, 539; 251 NW2d 77 (1976). Defendants simply pointed to cash deposits made into Express Oil's business account without notation as to where the cash came from and state that Express Oil's inability to provide its cash receipts book showing which customers had paid in cash and at what times was the best evidence defendants could have had to show that Express Oil was converting defendants' funds.

However, the testimony is clear and unequivocal from all parties in this case that despite the fact that Express Oil was supposed to invoice and bill customers, defendants did so. Defendants, then, at least had the records as to what was supposed to have been collected from each customer by Express Oil as they generated the same. Defendants also had their own bank records showing how much was deposited into its bank account each month by Express Oil (both parties testified that Express Oil generally deposited any monies collected from customers directly into defendants' account). Defendants' representatives also testified that they had contact daily with Alnouri's secretary regarding which clients had paid and how much and the amount of receivables that were behind. While defendants may not have been able to link a specific cash deposit to a specific customer, defendants have not explained why it could not have checked with the customer itself to determine what amounts had been paid in cash. Thus, the lack of Express Oil's cash receipt books did not *necessarily* preclude defendants from fairly establishing that Express Oil breached the contract by converting funds and did so prior to defendants breaching the contract. Therefore, dismissal would not be an appropriate sanction.

The trial court clearly considered that the documents requested by defendants were missing such that spoliation occurred. Because Express Oil received a letter from defendants in mid-July 2008 accusing it of mishandling and converting defendants' funds and breaching the parties' contract, Express Oil was on notice that a lawsuit was likely forthcoming. Express Oil also received notice of termination of the contract and closed its doors for business on July 31, 2008, at which time the testimony indicates all business records were at its place of business. Express Oil thus should have preserved its business records, including its cash receipt book, in anticipation of this suit; therefore, the trial court was within its discretion to grant a sanction. *Brenner*, 226 Mich App at 164. The trial court, in fact, instructed the jury as follows:

> Now, Express Oil in this case has not produced the cash receipt books. As this evidence was under the control of Express Oil and could have been produced by Express Oil, you may infer that the evidence would have been adverse to Express Oil if you believe that no reasonable excuse for Express Oil's failure to produce the evidence has been shown.

This was a permissible and appropriate sanction for the spoliation of evidence by Express Oil.

Defendants next assert that the trial court erred in denying their motions for summary disposition, directed verdict, and JNOV on Express Oil's breach of contract claim against them because Express Oil was the first party to materially breach the sub-jobber agreement. According to defendants, Express Oil breached the agreement in two material ways: (1) dissolving Express Oil such that the actual contracting party ceased to perform; and, (2) converting defendants' property. We find that (1) did not necessarily constitute a material breach and (2) the conversion did not pre-date defendants' breach, such that the trial court's denial of their motions was not in error.

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition. *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 202; 731 NW2d 41 (2007). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). In evaluating a motion for summary disposition brought under (C)(10), a reviewing court considers affidavits,

pleadings, depositions, admissions and other evidence submitted by the parties in the light most favorable to the party opposing the motion. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996); MCR 2.116(G)(5). If the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. *Id.* at 362–363.

We review de novo a trial court's denial of motions for directed verdict and JNOV. *Abke*, 239 Mich App at 361. We view the evidence, as well as any legitimate inferences, in the light most favorable to the nonmoving party and decide whether there existed a factual question about which reasonable minds might have differed. *Forge*, 458 Mich at 204.

That contracts are enforced according to their terms is a corollary of the parties' liberty to contract. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). This Court examines contractual language and gives the words their plain and ordinary meanings. *Coates v Bastian Brothers, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law," and "[i]f the language of the contract is unambiguous, we construe and enforce the contract as written." *Id.*

In *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003), our Supreme Court held that it is well established in our law that written contracts may always be modified because parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed. However, a unilateral modification is not permitted, i.e., there must be mutual assent. *Id.* "The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract." *Id.* at 373.

Relevant to the instant action, "[t]he rule in Michigan is that one who first [substantially] breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (citation and quotation marks omitted). "In determining whether a breach is material, the court should consider whether the nonbreaching party obtained the benefit it reasonably expected to receive." *Omnicom of Michigan v Giannetti Inv Co*, 221 Mich App 341, 348; 561 NW2d 138 (1997). "Other considerations include the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the wilfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract." *Id*. The failure to perform a substantial part of a contract or one of its essential terms is also considered a "substantial breach." *Rosenthal v Triangle Development Co*, 261 Mich 462, 463; 246 NW2d 182 (1933).

With respect to the summary disposition motion, the trial court denied the same based upon factual issues for resolution for the jury. The trial court stated on the record that the practices of the parties seemed to be somewhat in contradiction to the contract over a period of time and thus whether any changes justified termination of the contract were questions of fact. The ruling at that time was not in error. As the testimony revealed, there were several

-10-

obligations (such as invoicing customers) that the contract required Express Oil to undertake, yet by practice, were undertaken by defendants. The contract also, for example, required defendants to charge Express Oil a certain price for gasoline when they, in practice, charged it less. Thus, whether the "change" of Express Gas undertaking any or all obligations under the contract of Express Oil (or any other change for that matter) constituted a material breach by Express Oil could, given the parties' past practice of not adhering to the major terms of the contract, be deemed to be a question of fact for resolution by the jury. The denial of summary disposition to defendants on Express Oil's breach of contract action based upon Express Gas's participation was not in error.

There was also no error in the denial of directed verdict of JNOV in defendants' favor on the breach of contract action. For a breach of contract committed by Express Oil to have precluded its own breach of contract action against defendants it must have (1) been a material breach, and (2) preceded defendants' breach. Defendants have demonstrated neither.

For a breach to be material, several considerations are in order, the first of which is whether the nonbreaching party obtained the benefit it reasonably expected to receive. *Omnicom of Michigan*, 221 Mich App at 348. There is nothing to contradict that Express Oil essentially began doing business as Express Gas, for purposes of the sub-jobber contract, in 2004. There has been no allegation that Express Gas did not perform the exact duties, in the exact same manner, under the sub-jobber contract that Express Oil did, or that defendants did not obtain the same benefits that they expected or received from Express Gas that they had from Express Oil. By defendants' representatives' testimony, they did not even know that Express Oil had ceased doing business or was operating by or under Express Gas. Clearly, then, nothing had changed. Thus, it could be argued that Express Gas was simply the alter ego of Express Oil and there was no discontinuation of Express Oil's obligations under the contract that would amount to a material breach.

The failure to perform a substantial part of a contract or one of its essential terms is also considered a "substantial breach." *Rosenthal*, 261 Mich at 463. Again, there has been no allegation that once Express Oil ceased to function and Express Gas stepped in (both owned and operated by Alnouri and, according to testimony, operating only under one bank account at a time) a substantial part of the sub-jobber agreement was not performed. Defendants identified no noticeable change, aside from making the commission checks out to "Express" rather than "Express Oil." Lacking any allegation or evidence of lack of performance of any part of the sub-jobber agreement or failure to perform one of its essential terms, defendants' allegation that Express Oil's action in ceasing to carry out the functions of the contract and instead relegating the contract to its alter ego, Express Gas, is not a material breach of the parties' contract.

As to whether Express Oil's breach of the parties' contract preceded defendants' breach, the jury did find that Express Oil breached the parties' contract but it also found, in answer to a question on the verdict form, that defendants breached the contract first. However, the jury also found that Express Oil converted defendants' property, which, as argued by defendants, could conceivably have also formed the basis for Express Oil's breach of contract. The tort of conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins Co v Allstate Ins Co*, 439 Mich 378, 391; 486 NW2d 600 (1992). In an action for conversion of money, the defendant must have

-11-

an obligation to return the specific money entrusted to his care. *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 111-112; 593 NW2d 595 (1999).

The jury could have reasonably found that defendants breached the contract first, at the earliest in March 2008 or at the latest on July 31, 2008. Alnouri testified that defendants began withholding two amounts from his commissions beginning in March 2008 without his permission or agreement and in breach of the contract. Written contracts cannot be unilaterally modified; there must be mutual assent. *Quality Prod & Concepts Co,* 469 Mich at 372. Alnouri also testified to receiving a letter dated July 31, 2008, terminating the 10-year sub-jobber agreement which was not to be terminated by defendants except to the extent permitted by the Petroleum Marketing Practices Act. Thus, the jury could have found that defendants breached the contract on either date. For Express Gas and Alnouri's conversion to have constituted the first breach of contract it thus must have predated March 2008 or July 31, 2008. It does not.

It is undisputed that in August 2008, Alnouri sent defendants a letter advising them of payments that customers had made to him on defendants' accounts. According to defendants' representatives, there were no corresponding payments made into defendants' accounts for these payments. Express Oil does not deny in its appellate brief that it retained these funds and did not remit them to defendants. Defendants, on the other hand, did not support their burden of proof to establish that Express Oil converted any funds prior to the August 2008 date. They merely related that there were cash deposits into Express Oil's business account without notation and indicated that they had accounts receivable from customers. Defendants did not provide any evidence, however, that customers had made payments to Express Oil and that these customers were now claiming that they were not credited for the same by defendants. Thus, the jury could reasonably have found that Express Oil's only conversion (and thus, breach of contract) occurred in August 2008-after defendant's March 2008 or July 31, 2008, breach of contract. As a result, defendants were not entitled to a directed verdict or JNOV on Express Oil's breach of contract claim on the alleged premise that Express Oil breached the contract first.

Defendants next contend that a new trial is warranted based upon several evidentiary errors, none of which we find to have merit. First, defendants argue that they were deprived of a fair trial due to the trial court's refusal to allow defendants to use a summary of Express Oil's Charter One bank records until the very end of trial even though the summary was prepared in compliance with MRE 1006.

That rule provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

A summary must meet four requirements to be admissible under MRE 1006: (1) the summary must be of voluminous writings, recordings, or photographs that could not be examined conveniently in court; (2) the writings, recordings, or photographs must be admissible evidence; (3) the originals or duplicates of the summarized material must be available for examination or

copying by the other parties; (4) the summary must be accurate. *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 99; 535 NW2d 529 (1995).

The admission of the summary was subject to much debate. Ultimately, the trial court reserved ruling on the admission of the summary until cross-examination of Alnouri (called during plaintiff, Express Oil's, case-in-chief), indicating that defendants would have to first question Alnouri about checks written out of the account. During cross-examination of Alnouri, some of the first questions that defense counsel asked were whether Alnouri relied upon a summary (the one at issue) that was provided to him in order to answer interrogatories, whether he checked the contents of the summary to make sure it was accurate, and whether the summary appeared to be accurate and complete. Alnouri answered yes to all of the questions. However, defense counsel did not move for the admission of the summary at that time. Counsel, did not, in fact, move for the admission of the summary during or after Alnouri's testimony at all. Instead, defense counsel waited until after Express Oil rested its case and defendant had moved for directed verdict, and then was examining the second of its witnesses before it moved for the admission of the summary. Thus, while the summary likely met the requirements of MRE 1006, the trial court did not "refuse" to allow its admission until the end of trial, as alleged by defendants. Defendants' first few questions posed to Alnouri arguably established the accuracy of the summary and defendants could have moved for its admission at that time. The trial court also indicated, prior to Alnouri's testimony, that it had all of the time defendants needed and that defendants could ask Alnouri about every one of the checks if needed. The fact that defendants waited until after Alnouri's testimony had concluded completely and it had begun examining its own witnesses to move for admission of the summary does not render the trial court's decision concerning admission untimely or an abuse of discretion.

Defendants' second evidentiary challenge concerns comments made by Express Oil's counsel during trial. According to defendants, counsel committed reversible misconduct by repeatedly referring to defendants' purported corporate wealth in an effort to distract the jury from the facts and evidence.

The effect of an attorney's misconduct at trial may require retrial when the misconduct sought "to prejudice the jury and divert the jurors' attention from the merits of the case." *Kern v St. Luke's Hosp Ass'n of Saginaw*, 404 Mich 339, 354; 273 NW2d 75 (1978). Our Supreme Court, in *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102–103; 330 NW2d 638 (1982), offers guidance:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to

stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.

An attorney's comments usually will not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial. *Wilson v General Motors Corp*, 183 Mich App 21, 26; 454 NW2d 405 (1991). Further, even where an attorney may have attempted to deliberately inject improper argument into a case, reversal is unwarranted unless the comments had the effect of diverting the jury's attention from the issue or otherwise control the verdict. *Knight v Gulf & Western Properties, Inc*, 196 Mich App 119, 132-133; 196 NW2d 119 (1992).

During his opening statement, Express Oil's counsel stated that defendants ". . . are dealing with hundreds of millions of dollars a year in sales of gasoline out of that one business. Little Mr. Alnouri, he's like a corner store based, for the big monster company doing probably close to a million dollars—million gallons of gas a month." Counsel also indicated in his opening that defendants did the paperwork because "they were the big company," stated that Mr. Barrick started "giving orders that we could call our—for a strong arm," referred to this as a "David and Goliath story" and indicated that there is difference in size and scope of these two businessmen to where Alnouri has "12 little, 18 little, 16 little gas stations" and "this man has now over 500 gas stations that he's servicing." Defendants made no objections to these statements.

The only time defendants objected to a reference to their corporate wealth was during the cross-examination of Patrick Breen, account manager for defendants, after Breen testified that Barrick was upset because they had just lost over $300,000 on Alnouri's contracts, when plaintiff's counsel stated, "Mr. Barrick does five hundred, six hundred million dollars a year." As indicated, in *Reetz*, 416 Mich at 111, even isolated comments projecting an image in the minds of jurors of a party as an unfeeling powerful corporation are improper. However, such comments are not always incurable or constitute error requiring reversal. *Id*.

In this case, while defendants' corporate wealth was brought up on several occasions, defendants also made sure that the jury was apprised of the fact that Alnouri made over $300,000 per year and detailed other financial factors that would advise the jury Alnouri was not necessarily the "David" that Express Oil's counsel portrayed him to be. Based upon the evidence, it cannot be said that the statements about defendants' wealth so permeated the trial or influenced the jury that it caused the verdict or denied defendants a fair trial.

Defendants' challenges to other phrases used by Express Oil's counsel also fail. During Express Oil's cross-examination of Breen, he asked him several times about "beating up" Alnouri, essentially referencing brow-beating. Again, defendants did not object to use of this phrase. And, Breen responded, in at least one instance, "We're beating him up because . . . ." This could be viewed as an admission that defendants were, in fact, brow-beating Alnouri. Thus, use of the phrase was not improper but instead an accurate reflection of what was occurring. Express Oil's statement during closing argument that defendants "beat up" Alnouri would also not be improper because it accurately reflects the evidence.

Finally, defendants object to the trial court allowing Express Oil's counsel to read the depositions of defendants' officers and employees into evidence when they were available to testify in person at trial. A trial court's "decision whether to admit or exclude evidence is reviewed for an abuse of discretion." *Elezovic v Ford Motor Co*, 472 Mich 408, 419; 697 NW2d 851 (2005) (citing *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999)).

Ordinarily, depositions are considered hearsay and are inadmissible at trial. *Lombardo v Lombardo*, 202 Mich App 151, 154; 507 NW2d 788 (1993). MCR 2.308(A) provides, however that "Depositions or parts thereof shall be admissible at trial or on the hearing of a motion or in an interlocutory proceeding only as provided in the Michigan Rules of Evidence." MRE 804(b) provides that deposition testimony is not considered hearsay and thus may be offered as evidence if the testifying party is unavailable as a witness. As indicated in *Barnett v Hidalgo*, 478 Mich 151,174; 732 NW2d 472 (2007), however, "[W]hen a witness is available at trial, his or her deposition testimony is inadmissible, as hearsay, for substantive purposes."

At trial, plaintiff introduced nearly the entire depositions of Chuck Gallup, who did not appear at trial, Robert Barrick, who did not testify at trial but was noted by defendants' counsel to be present in the courtroom, and Patrick Breen who was both present in the courtroom and also testified live. We would first note that contrary to Express Oil's contention, the depositions do not *automatically* qualify as non-hearsay under MRE 801(d)(2). MRE 801(d)(2) excepts from hearsay admissions by a party opponent if:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . , or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . .

Thus, the statements of a party (or its representative) made during a deposition are not hearsay, and therefore are not objectionable on hearsay grounds. A "statement" is merely an "oral or written assertion." MRE 801(a). Although defendants' counsel objected to reading the depositions, counsel failed to identify portions of the depositions that did not qualify as "statements" or were objectionable on another evidentiary ground.

In any event, addressing the individual deposition testimony, it is unclear whether the trial court determined Mr. Gallup to be unavailable as a witness, and perhaps admitted his testimony under MRE 804(b) or found the deposition testimony to be admissible as an admission by a party opponent under MRE 801(d)(2). If, in fact, the admission of his deposition testimony was in error, an error in the admission of evidence is not grounds for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order unless refusal to take such action appears to the court to be inconsistent with substantial justice. MCR 2.613(A); *Merrow v Bofferding*, 458 Mich 617, 634; 581 NW2d 696 (1998). Gallup's testimony added very little to the proceedings and was neither helpful nor harmful to either party. He simply added background as to how the initial sub-jobber agreement with Alnouri came about, but testified that he never read the agreement, did not run the day-to day operations of

-15-

Pantall, and had little to do with defendants after 2006. Thus, even if the trial court abused its discretion in allowing Gallup's deposition testimony into evidence, the error does not require reversal.

The same holds true for Barrick's deposition testimony. Barrick's testimony is, like Gallup's, not particularly helpful or hurtful in either direction, and defendants have not argued as much. Barrick testified that he did not read the sub-jobber agreement and did not become familiar with its terms. He testified as to the purchase of Pantall and his unawareness of the sub-jobber agreement until 2008. He also testified that he began taking deductions from Alnouri's commissions at some point, but was unsure if the contract allowed for it. Testimony about the deductions was also offered through Breen and Alnouri. There is no indication that if admission of this evidence was erroneous that it would require reversal in order to avoid injustice. MCR 2.613(A); *Merrow*, 458 Mich at 634.

Breen's deposition testimony was read to the jury, but Breen also testified live. Breen's live testimony was not inconsistent with his deposition testimony and the evidence supported the jury's decision even absent Breen's deposition testimony. Thus reversal is not required, even if the admission of Breen's deposition testimony was in error.

On cross-appeal Alnouri, Express Oil, and Express Gas argue that the trial court erred in denying their motion for JNOV concerning the conversion verdict against Express Gas and Alnouri. We disagree.

Conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins Co*, 439 Mich at 391. In an action for conversion of money, the defendant must have an obligation to return the specific money entrusted to his care. *Head*, 234 Mich App at 111-112.

The evidence in this matter established that Alnouri would often receive payments from customers for gas deliveries made by defendants and that he would directly deposit those payments into their bank account. The evidence further established that after Alnouri received the termination letter on July 31, 2008, he wrote defendants a letter, in August 2008, indicating the several customers had paid him for gas previously delivered by them. Breen testified that he reviewed defendants' bank account records and there were no deposits in its accounts for the payments Alnouri indicated he received from the customers in August 2008. Alnouri did not deny keeping the payments from the customers. This evidence, alone, was sufficient to support a conversion verdict in favor of defendants/counter-plaintiffs.

It is true that the amounts Alnouri indicated that he received from the customers in August 2008 do not match up with the lesser amount awarded by the jury. However, a verdict "should not be set aside simply because the method of computation used by the jury in assessing damages cannot be determined, unless it is not within the range of evidence presented at trial." *Diamond v Witherspoon*, 265 Mich App 673, 694; 696 NW2d 770 (2005). And, while Alnouri, Express Oil, and Express Gas indicate that there is no basis for the amount of the jury's award, a rationale appears to this Court. In his August 1, 2008, letter Alnouri noted that he had received payments from 4 customers as follows:

| A & H minimart: | $31,044.95 |
|---|---|
| Jazzo: | $23,460.00 |
| A & M: | $16,334.85 |
| L & J: | $17,491.84 |

Looking at the summary of Express Oil/Express Gas's bank records from around the beginning of August, deposits into the account are shown from L & J in the amount of $17,491.84 and from A & M minimart in the amount of $16,290.00. The fact that the records show that Alnouri deposited amounts collected from A & M and L & J into his own account could have convinced the jury that he converted those amounts. The total deposited into Alnouri's accounts from those customers was $33,781.84—the exact amount awarded by the jury. The other accounts Alnouri said in his August 2008 letter that he collected do not appear to have been deposited into the account and the jury could thus have found insufficient evidence that he converted those funds.

Alnouri, Express Oil, and Express Gas further contend that the retained amounts could not be considered as a basis for conversion because they were exercising their right to set off. This argument fails. The sub-jobber agreement was between Express Oil and Pantall/Van Buren and it was Pantall/Van Buren that was found to have breached the sub-jobber agreement by terminating the contract (and possibly withholding amounts). A judgment was thus entered in favor of Express Oil, it being the party to the contract and to whom the amounts were owed. On the other hand, it was Alnouri and/or Express Gas that were found to have committed conversion. Alnouri, individually, and Express Gas, cannot set off damages owed to a separate company, Express Oil (which is still in existence). Separate corporate entities are, after all, respected. *Seasword v Hilti, Inc*, 449 Mich 542, 547-548; 537 NW2d 221 (1995).

Alnouri, Express Oil, and Express Gas next assert that the trial court abused its discretion by awarding treble damages and attorney fees to Pantall d/b/a Van Buren Oil and Van Buren Oil, LLC under MCL 600.2912a. The award was appropriate.

We review an award of treble damages and attorney fees by a trial court under MCL 600.2919a for an abuse of discretion. "The trial court abuses its discretion if its decision is outside the range of principled outcomes." *Morales v State Farm Mut Automobile Ins Co*, 279 Mich App 720, 729; 761 NW2d 454 (2008).

MCL 600.2919a provides:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying,

receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

The term "may" is permissive and indicates discretionary activity. *Aroma Wines and Equip, Inc v Columbia Distribution Servs, Inc*, 303 Mich App 441, 449-450; 844 NW2d 727 (2013). "Thus, under the language in MCL 600.2912a(1), treble damages and attorney fees are discretionary. Accordingly, whether to award treble damages is a question for the trier of fact." *Id*.

In this case, contrary to defendants' argument, the parties did not stipulate to an award of treble damages. Instead, the parties agreed that the award, along with reasonable attorney fees, were administrative matters and thus would not be presented to the jury. Defendants' counsel stated: "And then, the second thing is, is that there's an issue about treble damages. I'm not going to put that in my case in chief unless counsel thinks that he needs it. As far as I'm concerned . . . it's . . . an administrative . . . ." The court agreed that it was, to which Alnouri, Express Oil, and Express Gas's counsel agreed. That is not a stipulation that treble damages and attorney fees are necessarily recoverable but, rather, *if* they are, it is an administrative matter.

According to *Aroma Wines and Equip, Inc*, 303 Mich App at 449-450, the issue of whether to award treble damages is a question for the trier of fact. This matter thus should have gone to the jury. The parties and the court were under the mistaken belief, however, that it was an administrative matter to be undertaken by the court in entering judgment. That being the case, and the fact that an award of such damages is discretionary, the question becomes whether the trial court abused its discretion in trebling the damages and awarding attorney fees.

Treble damages awarded under MCL 600.2919a are punitive in nature. *Alken–Ziegler, Inc v Hague*, 283 Mich App 99, 104; 767 NW2d 668 (2009). The evidence in this matter indicated that at the time Alnouri kept the money that customers had given to him for deliveries they had already received from defendants, the sub-jobber contract had already been cancelled, rightly or wrongly, by defendants. Alnouri had a remedy of suing defendants for wrongful termination of the contract or wrongful withholding from his commissions, which he, in fact, undertook. Alnouri was aware that the customers gave the money to him as payment for a product they received from defendants and intended for him to convey the payment to defendants. Alnouri was also likely aware that his keeping the money could cause problems for the customers, innocent third parties. Under the circumstances, the trial court's exercise of discretion in awarding treble damages was not outside the range of reasonable and principled outcomes.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Amy Ronayne Krause